J-A07039-19

2019 PA Super 185

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| NALIK SHARIFF S. SCOTT | : | |
| | : | |
| Appellant | : | No. 604 EDA 2017 |

Appeal from the Judgment of Sentence December 23, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004102-2012,
CP-51-CR-0004104-2012, CP-51-CR-0004106-2012

BEFORE: OLSON, J., DUBOW, J., and STEVENS*, P.J.E.

OPINION BY STEVENS, P.J.E.: Filed: June 11, 2019

Appellant, Nalik Shariff S. Scott, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County after a jury convicted him of three counts of first-degree murder and related offenses described *infra*.[1] Appellant asserts twelve claims of trial court error, none of which has merit. We affirm.

---

[1] We observe that Appellant's single notice of appeal lists three trial court docket numbers. On June 1, 2018, our Supreme Court decided **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), which, in accordance with the official note to Pa.R.A.P. 341, held that separate notices of appeal must be filed when one or more orders resolves issues arising on more than one docket. "The failure to do so will result in quashal of the appeal." **Id.** at 977. The Supreme Court, however, applied **Walker** prospectively. **Id**. Therefore, because the instant appeal preceded **Walker**, we decline to quash it.

---

* Former Justice specially assigned to the Superior Court.

The trial court aptly sets forth pertinent facts and procedural history of the case *sub judice*, as follows:

> On December 21, 2016, following a capital murder jury trial before [the trial court], defendant Nalik Shariff Scott [hereinafter "Appellant"] was convicted of three counts of first-degree murder (18 Pa.C.S. § 2502), three counts of robbery (18 Pa.C.S. § 3701), one count of criminal conspiracy (18 Pa.C.S. § 903), one count of carrying a firearm without a license (18 Pa.C.S. § 6106), one count of carrying a firearm on the streets of Philadelphia (18 Pa.C.S. § 6108), and one count of possessing an instrument of crime (18 Pa.C.S. § 907). Appellant was tried with his co-defendant Ibrahim Muhammed. As the jury was unable to reach a consensus following a penalty phase hearing, the [trial court] imposed an aggregate sentence of three consecutive life sentences to be followed by fifty to one hundred years' incarceration (18 Pa.C.S. § 1102(a)(1)). Appellant filed post-sentence motions, which the [trial court] denied on January 25, 2017.

> FACTUAL BACKGROUND

> At trial, the Commonwealth presented the testimony of [numerous Philadelphia Police detectives and officers, a Philadelphia Firefighter lieutenant, a Delaware State Chief Medical Examiner, and several eyewitnesses. Co-Defendant Muhammed presented testimony from Philadelphia Police detectives and officers, several physicians, and numerous eyewitnesses. Appellant Scott presented the testimony of six Philadelphia Police Detectives.] Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

> On September 6, 2011, Porfirio Nunez, his wife Juana Nunez, and his sister Lina Sanchez, were working at their family owned Lorena's Grocery, which was located at the corner of 50th and Parrish Streets in Philadelphia. N.T. 12/7/16, at 223-224, 227. Also working that day were Porfirio and Juana's daughters, Jessica and Laura Nunez. N.T. at 12/7/16 at 227.[] At approximately 7:55 p.m., Porfirio was located by the back refrigerators, while Lina and Juana were in the back food preparation area and Jessica and Laura were at the front registers. N.T. 12/7/16 at 228; 12/8/16 at 216; 12/9/16 at 228. At that time, defendant

[hereinafter "Appellant"] and Ibrahim Muhammed entered the store. N.T. 12/7/16 at 228.

Upon entering, Appellant went behind the counter where Laura and Jessica were located and grabbed Laura by her hair, while Muhammed went to the back of the store where Lina and Juana were located. N.T. 12/7/16 at 228-229, 237; 12/8/16 at 216-217, 219-220. After Appellant grabbed Laura's hair, he pushed her to the ground, causing Laura and Jessica to scream. N.T. 12/7/16, at 228, 230; 12/8/16 at 216. Hearing his daughters' screams, Porfirio came out to the aisle to see what was going on at the front of the store. N.T. 12/7/16 at 228. Appellant, who was in possession of a 9-millimeter handgun, pointed the firearm at Porfirio and shot him through the arm and into his chest. N.T. 12/7/16 at 228, 230-232; 12/8/16, at 193-194; 12/12/16, at 323, 328-329. Porfirio then ran into the back of the store. N.T. at 12/7/16, at 228, 232. Hearing the gunshot, Muhammed then took out his own gun and began shooting Juana and Lina. N.T. 12/7/16, at 233. Muhammed shot Lina Sanchez in her abdomen and back before shooting Juana in the chest and top of her head. N.T. 12/7/16, at 233-236; 12/8/16, at 198-204. Muhammed then turned towards Porfirio and shot him three times in the chest and back. N.T. 12/7/16, at 233-236; 12/8/16, at 190.

After shooting Porfirio, Juana, and Lina, Muhammed walked towards Jessica while Appellant, still holding Laura to the floor, yelled at Jessica to "give [him] the money." N.T. 12/7/16, at 234-236; 12/8/16, at 217. Believing that she was about to be shot, Jessica opened the cash register. N.T. 12/7/16, at 236. Appellant and Muhammed then grabbed what they could from the register before leaving through the front door and fleeing the area. N.T. 12/7/16, at 131-133, 238-239; 12/8/16, at 217.

Police responded to the store to find Porfirio, Juana, and Lina [lying] on the floor inside the store. N.T. 12/6/16, at 270-272. Lina, who was still showing signs of life, was rushed to the Hospital at the University of Pennsylvania. N.T. 12/6/16, at 273-276, 298; 12/8/16, at 201. Juana and Porfirio were similarly transported to the hospital, though they did not show signs of life at the time. N.T. 12/6/16, at 281. Police recovered three projectiles and nine 9mm fired cartridge cases from the scene. N.T. 12/6/16, at 203-204, 208-09; 12/12/16, at 32-333. The medical examiner recovered five bullets from the bodies of the victims. N.T. 12/12/16, at 323.

Porfirio was shot a total of five times: twice in his chest, perforating his spleen, diaphragm, vertebrae, and spinal cord; once in his arm and chest, penetrating his left lung, heart, esophagus, and liver; once in his back, penetrating his lungs and vertebrae; and once in his hand. N.T. 12/8/16 at 190, 193-194. Lina Sanchez was shot a total of two times: once in the upper back, penetrating her back, neck, and mouth; and once in the abdomen, penetrating her colon, liver, and right kidney. N.T. 12/8/16, at 198-199. Juana was shot a total of three times: once in the base of her neck; once in her chest, penetrating her left lung, left pleura, and vertebrae; and once in the head, penetrating her brain and vertebrae. N.T. 12/8/16, at 202-204.

In early February, 2012, narcotics police officers observed Muhammed selling marijuana near the corner of Reedland Street and 62nd Street in Philadelphia, and subsequently arrested him. N.T. 12/9/16, at 106-111. Following his arrest, Muhammed informed police that he had information about robberies and shootings. N.T. 12/9/16 at 114, 116.

Muhammed was brought to the Southwest detectives' headquarters and talked with Detective Joseph Murray, who began to believe that Muhammed may have been involved in the Parrish Street murders at Lorena's Grocery. N.T. 12/9/16, at 149-150, 154. Muhammed was then brought to the Homicide Unit, where he was interviewed by Detective Thomas Gaul. N.T. 11/9/16, at 251-252.

Muhammed was given **Miranda** warnings and ultimately provided a statement inculpating himself in the murders. N.T. 12/9/16, at 254-259, 270; 12/12/16 at 89-99. Muhammed admitted to police that he and "Leek" went into the store to rob it, that he was in the back of the store with the women, that he heard a gunshot, and then pulled out his own gun and began firing. N.T. 12/12/16, at94-95. Muhammed stated that he was firing indiscriminately and that he may have shot a man accidentally as he was leaving the store. N.T. 12/12/16, at 94-95. Muhammed identified Appellant as his co-conspirator in the robbery/homicides. N.T. 12/12/16, at 96.

On February 10, 2012, police detectives prepared a photo spread containing Appellant's photograph and brought it to Jessica and Laura, who both independently identified Appellant. N.T. 12/7/16,

at 272-273; 12/8/16, at 237-238; 12/13/16, at 94-96, 112-113. Later that day, Jessica was brought to police headquarters where she identified Muhammed in a photo spread. N.T. 12/7/16, at 275-276; 12/13/16, at 97.

Trial Court Opinion, 6/14/17, at 1-6.

Appellant presents the following questions for our review:

1. Whether The Honorable [Trial Court] erred in preventing the defense from inquiring about potential jurors' bias against Muslims?

2. Whether The Honorable Trial Court erred by, during jury selection, automatically disqualifying potential jurors who indicated they would have any moral, religious or conscientious scruples that would prevent or substantially impair them from returning a death sentence or a life sentence without providing an opportunity for follow-up questions by counsel or the court to further explore the nature of those potential issues?

3. Whether The Honorable Trial Court erred by denying the defense's *Batson* motion?

4. Whether The Honorable Trial Court erred by permitting the prosecutor to, during opening argument, repeatedly refer to the defendants as "evil" with the object of prejudicing the jury against the defendants and erred by permitting the prosecutor to commit misconduct by consistently making impermissible appeals to emotion and racial bias throughout the trial?

5. Whether The Honorable Trial Court erred by allowing the prosecutor to impermissibly lead key witnesses during direct examination over numerous sustained defense objections to the impermissible conduct, such that the defense was prejudiced and erred by denying the defense a full and fair opportunity to cross-examine Commonwealth witnesses regarding their perception and memory of the incident?

6. Whether The Honorable Trial Court erred by denying the defense's motion to preclude the Commonwealth from presenting expert testimony concerning the quality of a video relevant to the defense's case due to the untimeliness of his report, that testimony's irrelevance, and the prejudice caused to the defense by such expert testimony?

7. Whether The Honorable Trial Court erred by permitting the prosecutor to impermissibly elicit irrelevant and highly prejudicial testimony concerning witness' [*sic*] fear of testifying and other evidence related to witness intimidation, erred in permitting that line of questioning and erred by allowing the prosecutor to impermissibly argue inflammatory evidence not of record concerning a witness' [*sic*] failure to identify the defendant at a line-up due to his fear of defense counsel or other motivations not of record?

8. Whether The Honorable Trial Court erred in permitting the prosecutor to argue that defense counsel were wealthy and that defendants had hired expensive defense lawyers and experts to defend them, in contrast to the prosecutor's more meager finances, in an attempt to inflame the prejudices of the jury?

9. Whether the Honorable Trial Court erred in permitting the prosecutor to agree to limit his cross-examination of a defense medical witness with regard to other, nationally recognized cases she had handled in the past to the state and year those cases occurred because to do otherwise would solicit irrelevant and prejudicial testimony, then deliberately solicit said information and also impermissibly put before the jury a video indicating the expert's involvement in a nationally recognized sensational case?

10. Whether The Honorable Trial Court erred by allowing the prosecutor to impermissibly manufacture rules of evidence and

imply untrue facts during his cross-examination of defense private investigator, thereby prejudicing the jury against the defense and defense's investigation into the case. **See**, *inter alia*, N.T. 12/19/16, 259-286.

11. Whether The Honorable Trial Court erred by permitting the prosecutor to make arguments about evidence that was not in the record, make outrageous arguments which were designed to prejudice the jury against defense counsel and the defendants, and misrepresent the contents of the record and erred by permitting the prosecutor to commit misconduct by consistently making impermissible appeals to emotion and racial bias throughout the trial?

12. Whether The Honorable Court erred in denying the defense's motion for a mistrial, as the prosecutor misrepresented the record and consistently made impermissible inflammatory appeals to emotion and racial bias throughout the trial including but not limited to closing argument?

Appellant's brief, at 6-7.

Appellant's first issue implicates the trial court's administration of *voir dire* questioning. In assessing Appellant's claim, we are guided by the following standard of review.

The scope of *voir dire* rests in the sound discretion of the trial court, whose decision will not be reversed on appeal absent palpable error. The purpose of *voir dire* is to ensure the empaneling of a competent, fair, impartial, and unprejudiced jury. The scope of *voir dire* should therefore be limited to questions that attempt to disclose a potential juror's lack of qualification or fixed opinion regarding the defendant's guilt or innocence. A prospective juror's personal views are of no moment absent a showing that these opinions are so deeply embedded as to render that person incapable of accepting and applying the law as given by the court.

*Commonwealth v. Karenbauer*, 715 A.2d 1086, 1094 (Pa.1998) (internal citations and quotation marks omitted).

Specifically, Appellant contends that the trial court erred during *voir dire* when it "prevented him" from asking individual venirepersons about potential bias against Muslims. Appellant and Co-Defendant are Muslims, have Muslim names, and groom themselves according to the Muslim faith, which made their faith an important aspect of trial, Appellant maintains. Also, one detective had stated on the record that he recognized co-defendant Muhammed by his "Osama bin Laden nose."

In fact, the issue of addressing venirepersons about possible anti-Muslim bias first arose when the Commonwealth filed a *motion in limine* seeking to preclude from *voir dire* any discussion of potential juror bias against Muslims. Defense counsel contested the motion and argued that such questioning was necessary, particularly given the detective's comments.

The court agreed that *voir dire* on this issue was appropriate because the detective's alleged comments would permit cross-examination of the detective and others to explore whether an anti-Muslim bias may have improperly influenced their investigation. The court ruled, however, that a single question directed to the group of venirepersons would suffice. Over Commonwealth objection, the trial court therefore indicated that it would ask the entire group of venirepersons, "Defendants are African-American Muslims. [Is there] [a]nything about that fact that would affect your ability to be fair and impartial in this case?" N.T. 11/28/16 at 61.

When the court then asked defense counsel, "Is what I'm doing satisfactory to you?", counsel replied, "It's better," and followed that sentiment with "I will accept your ruling." N.T. 11/28/16, at 63. The court reiterated its request that defense counsel not "do individual *voir dire* about religion[,]" to which defense counsel assured the court, "I heard your ruling and we will follow it." N.T. at 63-64. Subsequently, during *voir dire*, the one venireperson out of 300 who answered, "yes" to the court's group question was dismissed.

While the record demonstrates that counsel preferred to ask each individual venireperson the question regarding religious bias, he never objected to the court's proposed *voir dire* question. Therefore, we deem Appellant's issue waived. **See Commonwealth v. Houck**, 102 A.3d 443 (Pa. Super. 2014) (holding timely and specific objection at appropriate stage of proceedings required to preserve claim for appellate review).

Even if we did not find waiver, we would find no merit to Appellant's claim. Precedent acknowledges that a trial court should prevent the creation of "racial issues in a case where such issues would not otherwise have existed." **Commonwealth v. Richardson**, 473 A.2d 1361, 1364 (Pa. 1984). The trial court should avoid the creation of racial issues because it "might focus jurors' attentions upon skin color rather than upon the guilt or innocence of the accused." **Id**. This precept is especially important because the creation of a racial issue "might interfere with the delicate balance of an impartial trial

atmosphere, thereby beclouding the trial with prejudicial suggestions and implications." *Id*.

In the seminal case of *Richardson,* the defendant, an African American man, was charged with raping a white woman. During *voir dire*, the defendant requested that the trial court ask venirepersons five specific questions, each of which was designed to uncover racial biases. The trial court refused and, instead, asked the prospective jurors the single question of whether the racial difference between defendant and victim presented such a problem that it could interfere with their honest appraisal of the case and with their ability to be completely fair to both the Commonwealth and the defendant.

On appeal, the defendant claimed that the trial court erred by refusing to ask all five of his proposed questions. Exercising discretionary review from this Court's reversal of the trial court, the Pennsylvania Supreme Court held that

> [u]nder the circumstances, where there are not factors present to infuse the case with an enhanced racial sensitivity, and racial differences were not a focus of evidence at trial, the one *voir dire* question posed by the trial court was sufficiently specific and probing to reveal prejudices which might have bearing upon the case.

*Richardson*, 473 A.2d at 1364.

Here, while one detective's comment invited reasonable concern warranting inquiry into potential prejudices, the record shows that race or religious belief was not otherwise a focus of the evidence. Guided by *Richardson*, therefore, we would conclude that the court's single, group

question adequately addressed defense concerns, such that we would reject Appellant's claim on the merits were waiver not applicable.

In Appellant's second issue, he argues that the court erred when it dismissed potential jurors who indicated their morals and beliefs would prevent or substantially impair them from imposing the death penalty. Instead, Appellant asserts, defense counsel should have been given an opportunity to ask follow-up questions in an attempt to rehabilitate the potential jurors and show they were willing and able to eliminate the influence of scruples and impose a sentence consistent with legal principles.

The trial court responds that it asked questions of the jury precisely in accordance with the Pennsylvania Supreme Court decision in **Commonwealth v. Keaton**, 45 A.3d 1050 (Pa. 2012). In **Keaton**, the Court held that a judge's wide latitude in supervising *voir dire* included the power to dismiss potential jurors who answered death penalty qualification questions by stating their beliefs precluded them from imposing a death sentence. It was reasonable for the trial court to conclude, given such an answer, that further questioning would be illogical and fruitless. **Id.** at 1069-70.

Here, the dismissed jurors expressed the same preclusions as the jurors did in **Keaton**. They did not merely say they "objected" to the death penalty; they claimed their beliefs would necessarily prevent them from imposing the death penalty. Therefore, as Appellant directs us to nothing distinguishing the present case from **Keaton**, we find no reversible error on this issue.

Next, we address Appellant's challenge to the trial court's denial of his

**Batson**[2] motion. Specifically, Appellant maintains that the prosecutor

violated **Batson** by excluding four African-American venirepersons with its

first five peremptory challenges. We disagree.

> A **Batson** claim presents mixed questions of law and fact. Therefore, our standard of review is whether the trial court's legal conclusions are correct and whether its factual findings are clearly erroneous.
>
> In **Batson**, the [Supreme Court of the United States] held that a prosecutor's challenge to potential jurors solely on the basis of race violates the Equal Protection Clause of the United States Constitution. When a defendant makes a **Batson** challenge during jury selection:
>
>> First, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination.

**Commonwealth v. Edwards**, 177 A.3d 963, 971 (Pa. Super. 2018) (citations

and quotation marks omitted). "The trial court should consider the totality of

circumstances when determining whether the prosecutor acted with

discriminatory intent or engaged in purposeful discrimination."

**Commonwealth v. Towles**, 106 A.3d 591, 602 (Pa. 2014) (citation omitted).

This Court must give great deference to a trial court's determination that

---

[2] **Batson v. Kentucky**, 476 U.S. 79 (1986).

peremptory challenges were free of discriminatory intent, and we will not overturn the determination unless it was clearly erroneous. ***See id.***

The particular venireperson pool in question comprised nine Caucasians, nine African-Americans, and four Hispanics. According to Appellant, the Commonwealth's reasons for striking four African Americans—who had nothing in common besides being African American, Appellant argues—were pretextual. For example, one worked in a prison, which Appellant says ostensibly favored the Commonwealth. Another purportedly "stared at the prosecutor" for extended periods of time, a reason Appellant also summarily dismisses as an improper basis for removal.

The trial court responds, first, that of the six venirepersons from this group who were ultimately chosen for the jury, four were African-American. Also, the court found the Commonwealth's explanations for each of its five peremptory challenges to be both credible and race-neutral. The respective explanations were: attenuated residency in Philadelphia; prison employment duties included assessing inmates' medical needs and health issues; unusual staring at the prosecutor even when other persons were asking him questions; and young age and immature manner.

In the totality of these circumstances, we find no error where the Commonwealth provided the court with plausible, race-neutral explanations for each peremptory challenge and the trial court found Appellant failed to carry his burden of proving purposeful discrimination with his claim of pretext.

*See Towles*, *supra* at 602; *Edwards*, *supra* at 971. Appellant's *Batson* issue, therefore, merits no relief.

In his next issue, Appellant assails the court's ruling "permitting" the prosecutor to call the defendants "evil" and to appeal to the jury's emotions and racial biases.

In opening arguments, the prosecutor stated that "evil walked in the grocery store" and one of the victims "looked into the face of evil." N.T. 12/6/16, at 50-51. Neither Appellant's counsel nor Co-Defendant's counsel objected during the opening, although, afterward and outside the presence of the jury, Co-Defendant's counsel called the remark highly inappropriate and requested a curative instruction. Significantly for our purposes, Appellant's counsel elected not to join in the objection but instead stated, "let me deal with it myself." N.T. at 120.

The court, agreeing with Co-Defendant's counsel that a curative instruction was in order, issued the following instruction:

> You heard some comments from the prosecutor [where he] used the word "evil," and I just want to be clear . . . that was not appropriate, that you need to be dispassionate and consider the evidence without being overwhelmed by emotion . . . . You need to look at the facts, look at the evidence, and determine whether or not the Commonwealth has proved guilt beyond a reasonable doubt. That's your job.

N.T. at 120-21. Both Appellant's counsel and Co-Defendant's counsel accepted this instruction.

- 14 -

As shown, Appellant's counsel objected neither to the prosecutor's comments nor to the curative instruction, while also stating a preference to deal with the comments in his remarks.  Given this record, we find the issue waived.  ***See Houck***, ***supra***.

Next, Appellant contends that the trial court erroneously allowed the prosecutor to ask leading questions while denying Appellant the opportunity to cross-examine Commonwealth witnesses on their perception and memory of the incidents about which they testified.  Initially, we observe that Appellant offers no argument in his brief to support his assertion regarding the improper leading of witnesses.  Therefore, this aspect of the present issue is waived. ***See Commonwealth v. Freeman***, 128 A.3d 1231, 1249 (Pa. Super. 2015) (explaining that the failure to develop a legal argument in support of a claim results in waiver of the issue).

Appellant asserts that the court improperly sustained two Commonwealth objections to portions of the cross-examination of a key witness, Laura Nunez, regarding her ability to recollect investigators' physical features, as he claims this line of questioning pertained to Nunez's ability to identify her assailants.  The first objection occurred when Appellant's counsel prefaced a question to Ms. Nunez by stating he was "just curious" why she had a limited memory of what a white police officer looked like, and the second occurred when he asked what a detective, whom Nunez identified as a black male, looked like.  N.T. 12/9/16, at 54, 57.

The court explains that it sustained objections to both questions on relevancy grounds, as the interviews in question had occurred months after the robbery/murders, such that the connection between Ms. Nunez's ability to recollect the investigators' respective appearances and her ability to recollect her assailants was too tenuous to be relevant.

As a general rule, questions concerning the admissibility of evidence are committed to the sound discretion of the trial judge, whose rulings will not be disturbed on appeal absent an abuse of that discretion. *See Commonwealth v. Kennedy*, 959 A.2d 916, 923 (Pa. 2008). In terms of remoteness, this Court has indicated that this generally affects the weight—but not the admissibility—of the evidence; further, the Court has emphasized the deference due to the trial court in the exercise of its discretion. *Commonwealth v. Reed*, 990 A.2d 1158, 1168 (2010).

Our review of Appellant's argument against the two rulings in question, however, reveals that he failed to support this bare assertion of error with any reference to legal authority. Accordingly, this issue affords him no relief. *Commonwealth v. Russell*, --- A.3d ----, 2019 PA Super 143 (filed May 3, 2019) (finding claim waived for failure to cite any authority in support of position).[3]

---

[3] The same failure to cite to authority defeats Appellant's remaining argument charging undue restriction of his cross-examination rights. Specifically, Appellant contends the court erroneously sustained an objection to counsel's cross-examination of Ms. Nunez after he had asked her how she could credibly

In Appellant's sixth enumerated issue, he argues that the court erred when it denied a defense motion to preclude the Commonwealth from presenting expert testimony from Detective James Dunlap regarding the quality of video surveillance footage obtained from a store located near the crime scene. Defense counsel objected to the expert testimony because Detective Dunlap had not submitted an expert report prior to trial pursuant to Pa.R.Crim.P. 573, and because counsel had made representations to the jury regarding the video during opening arguments.

The trial court opines that Appellant has waived this claim because defense counsel agreed with the court's ruling, after argumentation on the point, that Detective Dunlap was permitted to testify about technical aspects of video quality but not about what the video may or may not have depicted.

The record supports the trial court's opinion. During discussion on this issue, the court observed it discerned nothing objectionable or prejudicial about the detective's testimony. N.T. 12/13/16, at 88-89. Appellant's counsel concurred, stating "I don't have a problem with it now, Judge, and I will state that for the record . . . in all fairness, I will withdraw the issues that I raised

_____

claim to have seen co-defendant Muhammed's face when he grabbed her hair from behind. *See* N.T. 12/9/16, at 69-71. The record, however, belies the implication that the ruling prevented further development of this point.

In fact, the objection was limited to the phrasing of the question, and the court not only permitted counsel to rephrase the question that he, himself, admitted was "probably phrased poorly," but also allowed him to ask several follow-up questions to develop the theory that Ms. Nunez's view of Muhammed was limited. N.T. at 71-72. Accordingly, were we to address this argument on its merits, we would find it unavailing.

before." N.T. at 89-90. This issue, therefore, is waived for purposes of appellate review.

Appellant next contends that the trial court erroneously permitted the Commonwealth to explore the issue of witness intimidation during its cross-examination of defense witnesses whose testimonies diverged from earlier incriminating statements against co-defendant Muhammed and, by association, Appellant. We disagree.

At trial, the Commonwealth presented evidence that co-defendant Muhammed had confessed to his involvement in two other robberies as well as in the grocery store murders at issue in the case *sub judice*. Muhammed sought to discredit his confession by presenting witnesses who testified that he had no involvement with the other robberies, the implication arising that if part of his confession were undermined then his confession to the grocery store murders would also be placed in doubt. *A fortiori*, Appellant argues, the case against him as Muhammed's cohort likewise would weaken.

In response to this testimony, the Commonwealth sought to elicit on cross-examination that the witnesses had been intimidated or threatened into providing this testimony. Part of this proffer consisted of evidence showing someone had taken photographs of people in the courtroom and courtroom lobby during trial and posted them to Appellant's Facebook page. The witnesses testified they, in fact, felt fearful and intimidated from the photographs. N.T. 12/14/16, at 22-23, 111-112; 12/16/16, at 164-166.

The court ruled that because the witnesses were now testifying in a manner completely contradictory to their earlier sworn statements and testimonies, it was proper for the Commonwealth to explore the possibility of witness intimidation. The court instructed the jury on the limited purpose of such evidence:

> **THE COURT:** Ladies and gentlemen, I'm admitting [Witness Rodriguez's testimony that she feared for her safety] only to the extent that, if you find that that was said, to the extent that you find it helpful in evaluating the behavior and testimony of this witness.
>
> There's been no evidence that any of that has anything to do with these two defendants, and so you may not infer from anything that you just heard that there is evidence of consciousness of guilt or misconduct on the part of the defendants. There's been no evidence of that. You understand the limited purpose for which I've allowed it.

N.T. at 164-167.

Later, the court gave another instruction explaining the limited purpose of the Facebook photographs admitted into evidence.

> **THE COURT:** [Y]ou just saw those photographs that were on [Appellant's] Facebook page of this courtroom. That evidence is admissible for one purpose only, that is to say on the issue of whether any witnesses in this case were intimidated. . . .
>
> You may not consider the evidence that you just saw as evidence of consciousness of guilt on the part of the defendants, since there's no evidence in this case that the defendants were responsible for postings on [Appellant's] Facebook page.
>
> So the only reason you may consider it, to the extent you find it's probative of the issue, is on whether witnesses who testified here were intimidated.

N.T. 12/20/16, at 48.

Appellant now complains, "The Commonwealth was permitted to discredit the defense without any substantive evidence that the defendants had threatened or intimidated anyone. As a result, a new trial should be granted." Appellant's brief at 29.

Our courts have "long recognized that any attempt by a defendant to interfere with a witness's testimony is admissible to show a defendant's consciousness of guilt." *Commonwealth v. Rega*, 933 A.2d 997, 1009 (Pa. 2007). So, too, have we permitted the Commonwealth to develop a line of questioning designed to reveal that a witness changed his testimony for fear of the consequences of testifying truthfully. *See*, *e.g.*, *Commonwealth v. Collins*, 702 A.2d 540, 544 (Pa. 1997) (recognizing well-established precedent that third-party threats are admissible to explain a witness's prior inconsistent statement).

Contrary to Appellant's apparent belief, it was not necessary for the Commonwealth first to establish Appellant's or Co-Defendant's direct involvement in the Facebook photographs before gaining admission of such evidence. The evidence was relevant not to show either defendant's consciousness of guilt but to show, instead, a possible reason for the witnesses' sudden disavowals of prior statements implicating Co-Defendant in other robberies. The admission of the evidence for this purpose is consistent with precedent set forth in *Collins*, and the trial court properly instructed the

jury as to the limited purpose of the evidence.  Accordingly, we find no merit with Appellant's evidentiary challenge.[4]

In his eighth issue, Appellant contends the court improperly allowed the prosecutor to make a closing argument that included references to the defendants' hiring of expensive expert witnesses, whereas the Commonwealth had far fewer resources with which to make its case.  Specifically, Appellant claims not only that the statements were false, as Co-Defendant was represented by a court-appointed attorney and relied upon court-appointed funds to hire his mental health experts, but also that they unfairly prejudiced the jury against the defendants.  Appellant's brief, at 31.

It is well settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial "unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Fletcher*, 861 A.2d 898, 916 (Pa. 2004) (citation omitted).  Like the defense, the prosecution is accorded reasonable latitude and may employ oratorical flair in arguing its version of the case to the jury. *Commonwealth v. Williams*, 896 A.2d 523, 542 (Pa. 2006) (citations omitted).

---

[4] While Appellant's Statement of Questions Presented assails the Commonwealth's reference to such evidence in closing arguments, his Argument section does not develop this aspect of the claim.

In addition, a challenged prosecutorial comment must be viewed not in isolation but in the context in which it was made. ***Commonwealth v. Hutchinson***, 25 A.3d 277, 307 (Pa. 2011). We will not find prosecutorial misconduct from comments based on the evidence or derived from proper inferences. ***Commonwealth v. Chester***, 587 A.2d 1367, 1377 (Pa. 1991). Our review of prosecutorial remarks and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial. ***Commonwealth v. Judy***, 978 A.2d 1015, 1019 (Pa.Super. 2009).

Appellant's single paragraph, generalized argument specifies neither the statements he challenges nor where in the record this Court may find the statements. The trial court's Pa.R.A.P. 1925(a) Opinion, however, references several passages during closing arguments where the prosecutor suggests that the defense experts represented "the best defense money can buy," and would "say whatever" if they were paid enough. N.T. at 12/21/16, at 41; Trial Court Opinion, at 24. Given the trial court's ability to identify the particular statements at issue and author a responsive opinion to Appellant's argument, we proceed with our review of Appellant's claim.

The trial court considered the prosecutor's references to his own comparatively low hourly rate and deemed them harmless, passing remarks, even if they were technically inappropriate to the extent they suggested a disparity in compensation that was not part of the evidentiary record. Addressing the prosecutor's commentary on expert witnesses, the trial court

cited to decisional law holding that reference to an expert's compensation, *see Commonwealth v. Thompson*, 93 A.3d 478, 491 (Pa. Super. 2014), and history of testifying exclusively for defendants, *see Commonwealth v. Smith*, 995 A.2d 1143, 1162-63 (Pa. 2010), may be part of a reasonable "potential bias" argument against the expert's opinion.

Moreover, the trial court observes, the record establishes that cross-examination of the experts' compensation and history as defense witnesses supplied an evidentiary basis for the prosecutor's closing argument suggesting a potential for bias. On balance, therefore, the court considered the prosecutor's closing argument to be within the bounds of fair comment.

Appellant directs us to no pertinent, contrary authority on this point to support his position, and our own conclusion, after careful review, aligns with the trial court's disposition. Accordingly, in the absence of evidence showing an unavoidable prejudicial effect from the comments in question, Appellant is due no relief on this claim.

In Appellant's ninth issue, he argues that the trial court erred in its response to Co-Defendant's objection during the prosecution's cross-examination of the defense's expert medical witness. Specifically, the court had made a pretrial ruling permitting the prosecution on cross-examination to inform the jury that the medical expert had provided mental health testimony in previous criminal trials, but preventing it from revealing with any specificity that one case involved the widely publicized Colorado movie theater shooting spree, which was tried in the year before the case *sub judice*. During cross-

examination, however, the prosecutor named the case specifically, purporting it was fair response to the expert's claim that she had only testified for the defense on two prior occasions, when the "Colorado Theater Shooting" case represented the third case in which she so testified.

The trial court sustained Co-Defendant's objection, N.T., 12/19/16, at 62, and during a subsequent break admonished the prosecution for needlessly revealing the subject matter of the Colorado trial. N.T. at 78-81. The court, then, reviewed the prosecution's intended use of a video[5] from the Colorado trial to supplement cross-examination of the expert, and it determined the video was unnecessary unless the expert directly contradicted areas of her testimony depicted in the video, at which point the court would conduct a side-bar discussion prior to approving use of the video. N.T. at 82-87. Neither defense counsel moved for mistrial, asked the court to determine if any juror

_____

[5] A still of the video was visible momentarily before the court excused the jury and invited argument on the admissibility of the video. During argument, Co-Defendant's counsel noticed the words "Live Theater Shooting Trial" at the lower left-hand of the screen. N.T. at 80-81. The prosecutors claimed they could not see the wording, nor could the court see it, but the court ordered the lights dimmed and asked Co-Defendant's counsel to sit in the jury box and say whether the words were visible from that vantage point. N.T. at 81. Counsel said "Yes, it's not hard. It says 'Colorado' with a big seal, 'Colorado County' behind it in the back of the frame." N.T. at 81-82. As discussed, *infra*, the court excluded the video without prejudice to the prosecution's right to reargue the matter should the expert's pending testimony increase the probative value of the video.

observed the writing on the video still, or objected to the court's handling of the matter in any way. Moreover, the video was not shown to the jury.

Herein, Appellant now advances a single-page argument cursorily positing that the prosecutor's question and the display of the video still were not harmless because the Colorado case was "covered by the press and [was] notorious." Appellant's brief, at 32. Appellant cites to no authority to support his position. We, therefore, find the present claim waived. **See Russell**, **supra**. In the alternative, we would concur with the trial court's apt observation that Appellant's counsel did not object to the prosecutor's cross-examination, **see** N.T. 12/19/16 at 60-87, thus compelling a finding of waiver pursuant to Pa.R.A.P. 302(a).

The same failure to cite to pertinent authority impedes our ability to review Appellant's next issue, which maintains that the trial court impermissibly allowed the prosecutor to impeach the credibility of co-defendant Muhammed's investigator. Specifically, the investigator testified that his interview of Muhammed's relatives produced statements asserting that the length and style of Muhammed's facial hair at the time of one prior robbery to which Muhammed confessed involvement did not match that worn by the suspect depicted on a video of the robbery.

On cross-examination, the prosecutor developed a line of questioning asking why the investigator failed to record such family statements in writing as he admitted he would normally have done in the course of his business. The gist of the cross-examination appears to have been that the investigator's

failure to memorialize betrayed a motive to avoid producing all his notes, which may have also contained material contrary to co-defendant Muhammed's interest.

Appellant baldly asserts that such a suggestion was impermissible, but he fails to develop a legal argument to this end, for which reason we deny him relief.  **See Russell**, **supra**.  Furthermore, the trial court again notes correctly that Appellant failed to object to that part of the Commonwealth's cross-examination of the investigator presently in question, which results in waiver pursuant to Pa.R.A.P. 302.

Appellant's eleventh issue charges the trial court with erroneously permitting the prosecutor "to make arguments about evidence that was not in the record, make outrageous arguments which were designed to prejudice the jury against defense counsel and the defendants, and misrepresent the contents of the record with appeals to emotion and racial bias throughout the trial.  The court responds to this issue by pointing to Appellant's Pa.R.A.P. 1925(b) concise statement, which presents this issue broadly and nonspecifically and cites "generally" to the Notes of Testimony of 12/21/16.

We observe that, generally,

> issues not raised in a Rule 1925(b) statement will be deemed waived for review.  An appellant's concise statement must properly specify the error to be addressed on appeal. In other words, the Rule 1925(b) statement must be "specific enough for the trial court to identify and address the issue [an appellant] wishe[s] to raise on appeal." **Commonwealth v. Reeves**, 907 A.2d 1, 2 (Pa.Super. 2006), **appeal denied**, 591 Pa. 712, 919 A.2d 956 (2007).  "[A] [c]oncise [s]tatement which is too vague

to allow the court to identify the issues raised on appeal is the functional equivalent of no [c]oncise [s]tatement at all." ***Id***. The court's review and legal analysis can be fatally impaired when the court has to guess at the issues raised. Thus, if a concise statement is too vague, the court may find waiver.

***Commonwealth v. Hansley,*** 24 A.3d 410, 415 (Pa.Super. 2011) (some internal citations omitted).

Here, we discern no error with the trial court's conclusion that the vagueness of Appellant's Pa.R.A.P. 1925(b) statement on this issue left the court in a position to guess what specific issues were being raised, thus impairing its ability to identify the instances of prosecutorial misconduct alleged. We, therefore, adopt that conclusion as our own.

Furthermore, even if we were to forego Rule 1925(b) waiver and review the entire notes of testimony of December 21, 2016, in light of Appellant's briefed argument, we would find no relief is due. Specifically, Appellant's argument does little more than string together a series of what he deems objectionable remarks during the prosecutor's closing and summarily proclaim that they must have prejudiced the jury. The remarks included a reference to the compensation received by the expert medical witness, an unidentified comment about the investigator, unspecified privileged conversations between counsel and employees, and an unspecified comment co-defendant Muhammed made about the Appellant. Appellant's brief, at 34. With respect to these prosecutorial remarks, we conclude Appellant has failed to develop a meaningful argument that the court erred in "permitting" them.

Also falling under the broad umbrella of his Pa.R.A.P. 1925(b) statement in question, Appellant maintains, is his claim that the court improperly overruled an objection to the prosecutor's closing argument reminding the jury that defense counsel never made good on its opening statement promise that he would prove who really committed the other murders and robberies to which Muhammed had confessed. Specifically, Appellant maintains the Commonwealth engaged in improper burden-shifting when it made this remark.

Initially, this claim was not readily inferable from Appellant's Rule 1925(b) statement, and we therefore find it waived on that basis. In any event, we discern no merit to the claim, as this type of Commonwealth response to the absence of evidence promised by a defendant, however, was within the bounds of permissible advocacy under the circumstances. *See* ***Commonwealth v. Paddy***, 800 A.2d 294, 317 (Pa. 2002) (holding Commonwealth appropriately reminded jury of absence of evidence promised by defense). Finally, we note that the trial court clearly instructed the jury that the Commonwealth, alone, bore the burden of proving every element of the crimes charged beyond a reasonable doubt. The record, therefore, belies Appellant's claim of burden shifting.

In support of his final issue, which assigns error with the court for denying his motion for mistrial, Appellant begins by summarily arguing:

> The cumulative effect of the Commonwealth's improper cross examination of multiple defense witnesses, the introduction of prejudicial evidence, and finally, the inflammatory closing

argument, should have resulted in a mistrial. "A mistrial is an 'extreme remedy' that is only required where the challenged event deprived the accused of a fair and impartial trial. The denial of a mistrial is reviewed for an abuse of discretion." ***Commonwealth v. Laird***, 988 A.2d 618, 638 (Pa. 2010). The Commonwealth's closing argument was so inflammatory, the jurors were tainted by the statements.

Appellant's brief, at 36. Appellant predicates this claim, however, on a notion we have already rejected, namely, that the Commonwealth's conduct during trial and closing arguments had the unavoidable effect of prejudicing the jury so it could not render a fair verdict. This claim, therefore, fails.

In the second part of his final issue, Appellant raises a claim of cumulative error. Specifically, he contends that the cumulative prejudice resulting from multiple errors committed throughout the proceedings denied him a fair trial.

We have repeatedly held that:

an appellant cannot bootstrap a series of meritless claims into a cumulative claim of error. ***See Commonwealth v. Rolan***, 964 A.2d 398, 411 (Pa.Super. 2008) ("No **number** of **failed** claims may **collectively** attain merit if they could not do so **individually**.") (quoting ***Commonwealth v. Williams***, 532 Pa. 265, 615 A.2d 716, 722 (Pa. 1992) (emphasis in original).

***Commonwealth v. Patterson***, 180 A.3d 1217, 1233 (Pa. Super. 2018), *quoting* ***Commonwealth v. Kearney***, 92 A.3d 51, 62 (Pa. Super. 2014).

Therefore, we reject Appellant's final claim.

Judgment of sentence affirmed.

*Judgment Entered.*

- 29 -

_____

_Joseph D. Seletyn, Esq._
_Prothonotary_


_Date:_ _6/11/2019_