J-S35010-24

2025 PA Super 18

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NATHANIEL JOSEPH KIMMEL | : | |
| | : | |
| Appellant | : | No. 1751 MDA 2023 |

Appeal from the Judgment of Sentence Entered December 8, 2023
In the Court of Common Pleas of Schuylkill County
Criminal Division at No(s):  CP-54-CR-0001651-2020

BEFORE:  PANELLA, P.J.E., MURRAY, J., and KING, J.

OPINION BY PANELLA, P.J.E.:                    **FILED: JANUARY 24, 2025**

Nathaniel Joseph Kimmel appeals from the judgment of sentence entered in the Court of Common Pleas of Schuylkill County following his conviction of first-degree murder, and other related charges, at a non-jury trial. Kimmel challenges the denial of his suppression motion, the authentication of a written letter, and the weight of the evidence. After careful review, we affirm.

The trial court set forth the relevant procedural and factual history.[1]

> On August 30, 2020, April Mahmod (hereinafter, the "Victim") was brutally murdered in an attack that began in her home . . . in Shenandoah, Pennsylvania, and continued outside onto the porch of the residence next door. The Victim was stabbed sixty-one (61) times, several of said wounds were to vital parts of

---

[1] We discern the relevant procedural and factual history from both the trial court's Pa.R.A.P. 1925(a) opinion and opinion addressing Kimmel's omnibus pretrial motion. We commend the Honorable James P. Goodman for his thorough opinions in addressing these matters.

her body and at least seven (7) of the wounds would have been life threatening and/or could have caused death.

On the date of the attack, [Kimmel] was charged with various criminal charges related to the Victim's death.FN3 On November 25, 2020, the Commonwealth filed a Notice of Intent to Seek the Death Penalty. . . . However, at a [s]tatus [h]earing which was originally held on November 16, 2023, and continued to November 20, 2023, the Commonwealth made a motion to withdraw the death penalty, as a result of, [Kimmel] executing a [w]aiver of [j]ury [t]rial. Said motion was granted by th[e trial c]ourt.

> FN3: By [c]riminal [i]nformation filed November 23, 2020, [Kimmel] was charged with the following crimes: Count 1, Murder of the First Degree, 18 Pa.C.S. §§ 2501(a) & 2502(a); Count 2, Murder of the Second Degree, 18 Pa.C.S. § 2502(b); Count 3, Murder of the Third Degree, 18 Pa.C.S. § 2502(c); Count 4, Aggravated Assault, 18 Pa.C.S. § 2702(a)(1); Count 5, Burglary, 18 Pa.C.S. § 3503(a)(1)(i); Count 6, Aggravated Assault with a Deadly Weapon, 18 Pa.C.S. § 2702(a)(4); Count 7, Criminal Trespass, 18 Pa.C.S. § 3503(a)(1)(ii); Count 8, Possessing Instruments of Crime, 18 Pa.C.S. § 907(a); Count 9, Simple Assault, 18 Pa.C.S. § 2701(a)(1); Count 10, Simple Assault with a Deadly Weapon, 18 Pa.C.S. § 2701(a)(2); and Count 11, Recklessly Endangering Another Person, 18 Pa.C.S. § 2705.

The non-jury trial began on November 20, 2023, with the Commonwealth presenting testimony from Pennsylvania State Police ("PSP") Trooper Shawn Tray. Upon agreement of the parties, the trial reconvened in progress on December []5, 2023. Following the conclusion of the trial on December []8 2023, th[e trial c]ourt found [Kimmel] guilty of Count 1 and Counts 4 through 11. [Kimmel] was sentenced that same day.

Trial Court Opinion, 3/25/24, at 1-2 (one footnote omitted).

For his conviction of first-degree murder, Kimmel was sentenced to life in prison. Kimmel did not file a post-sentence motion. He timely appealed. The trial court issued a Pa.R.A.P. 1925(a) opinion.

Kimmel raises the following issues for our review.

1. Did the trial court err in denying defense counsel's motion to suppress various [s]earch [w]arrants as being issued without probable cause and upon unverified information?

2. Did the trial court err in allowing letter and testimony regarding letter allegedly written by defendant admitted as exhibit 146 due to improper foundation and authentication?

3. Was the verdict in this case against the weight of the evidence?

Appellant's Brief, at 7 (suggested answers omitted).

In his first issue, Kimmel challenges whether probable cause existed for the August 30, 2020, search warrant applications. These search warrants pertained to his person, his vehicle, his residence, and his grandparents' residence. The affidavits of probable cause for the August 30, 2020, search warrants contained a misstatement that Kimmel was positively identified by a witness as the attacker. This was not true as the witnesses only provided a general description of the assailant.[2] Kimmel argues that absent this misstatement there was not probable cause for the issuance of the search

_____

[2] Two witnesses saw the attack and the assailant flee. Both provided a similar general description of the assailant as a male around six feet tall and weighing about 200 pounds. Kimmel matched this general description.

warrants because the warrants only included a vague description of a male.

*See id.* at 14-15. Kimmel's argument is without merit.[3]

> A search warrant may issue only upon a demonstration of probable cause by an affiant. The existence of probable cause is measured by examining the totality of the circumstances. Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he or she has reasonably trustworthy information are sufficient in and of themselves to warrant a person of reasonable caution in the belief that a search should be conducted. A magisterial district judge, when deciding whether to issue a search warrant, must make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit . . . including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. Conversely, a court reviewing a search warrant determines only if a substantial basis existed for the magistrate to find probable cause.

*Commonwealth v. Jacoby*, 170 A.3d 1065, 1081-82 (Pa. 2017) (internal brackets, citations, and quotation marks omitted). "If a search warrant is based upon an affidavit containing deliberate or knowing misstatements of material fact, the search warrant is invalid, unless probable cause exists notwithstanding any deliberate omissions or misrepresentations of fact."

*Commonwealth v. Adorno*, 291 A.3d 412, 417 (Pa. Super. 2023) (citations omitted).

---

[3] The trial court addressed this issue in its omnibus pretrial motion opinion and order. *See* Trial Court Opinion, 11/19/21, at 9-11. The trial court did not address this issue in its 1925(a) opinion because Kimmel did not raise this issue in his concise statement. "[I]ssues not raised in a Rule 1925(b) statement will be deemed waived for review." *Commonwealth v. Scott*, 212 A.3d 1094, 1112 (Pa. Super. 2019) (citation omitted). However, even in addressing the merits we find that no relief is due.

- 4 -

We agree with the trial court's determination that absent the misstatement probable cause still existed. *See* Trial Court Opinion, 11/19/21, at 9-11. Furthermore, there is nothing in the record that indicates that the misstatement was deliberate or intentional. Based on the crime scene, police determined that the attack began inside the Victim's residence and ended on the porch next door. *See id.* at 10. Kimmel had a similar height and build to the description of the perpetrator given by two eyewitnesses. *See id.* Kimmel and the Victim had previously had a romantic relationship. *See id.* The Victim was granted a PFA order against Kimmel which she withdrew about six weeks before the murder. *See id.* Further, Kimmel told police that he was coyote hunting during the time the incident occurred, and he went to his grandparents' house to shower and change his clothes that morning a few hours after the murder was committed. *See id.* at 10-11. That same morning, Kimmel was observed arriving at his residence in his vehicle. *See id.* It was reasonable to conclude that Kimmel was searching for places to hide contraband and clean up after committing the murder. Thus, based on the totality of the circumstances, there was a substantial basis for the magistrate to find probable cause and it was reasonable to conclude that evidence of the crime would be found on his person, in his vehicle, in his residence, or at his grandparents' residence. Therefore, Kimmel's argument is without merit.

Next, Kimmel claims that the trial court erred in admitting Commonwealth Exhibit 146 into evidence because it was not properly

authenticated. **See** Appellant's Brief, at 15-16. Exhibit 146 was a letter confessing to the murder which was purported to be signed and written by "Bill Steaver."[4] At trial, Kimmel's cellmate, Nathan Smithmyer, identified the letter as being written by Kimmel. **See** N.T., 12/6/24, at 463-67. Kimmel argues that Smithmyer's testimony was inadequate to authenticate the letter because it was not credible and Smithmyer was only able to say that he saw the letter in Kimmel's possession but never witnessed Kimmel write the letter. **See** Appellant's Brief, at 15-16. Kimmel's argument is without merit.

"[T]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). "A document may be authenticated by circumstantial evidence." **Commonwealth v. Sexton**, 222 A.3d 405, 417 (Pa. Super. 2019) (citation omitted). "Proof of any circumstances which will support a finding that the writing is genuine will suffice to authenticate the writing." **Commonwealth v. Bowens**, 265 A.3d 730, 759 (Pa. Super. 2021) (*en banc*) (citation omitted).

_____

[4] "William Stever a/k/a Bill Stever, testified at trial that he met [Kimmel] for the first time while they were both incarcerated at the [Schuylkill County Prison ("SCP")] in 2020. He denied authoring the Bill Steaver Letter, and indicated that his name was spelled incorrectly in said letter. Additionally, Stever further denied knowing the Victim or having anything to do with her death." Trial Court Opinion, 3/25/24, at 9 n.16.

We discern no error in the trial court's conclusion. The trial court summarized the relevant evidence in authenticating Kimmel as the author of Exhibit 146.

> At trial, Smithmyer testified that he observed [Kimmel] writing portions of the Bill Steaver Letter while they were cellmates, he identified said letter based on its contents and he was familiar with [Kimmel's] handwriting because he observed [Kimmel] writing other letter(s) and/or practicing cursive while they were incarcerated. The testimony of CO Rodriguez and CO Oliver reflect that they observed [Kimmel] trying to conceal the Bill Steaver Letter in his waistband during the September 27, 2020 cell search, and that they retrieved the letter, along with Commonwealth's Exhibit 147, from [Kimmel's] bed. Further, Stever's testimony reflects that he did not author the Bill Steaver [L]etter, and that he had no involvement in the Victim's death. As such, we determined that Smithmyer's testimony properly authenticated the Bill Steaver Letter and established that it was authored by [Kimmel].

Trial Court Opinion, 3/25/24, at 12 (footnote omitted).[5] Further, contrary to Kimmel's contention, it is not true that Smithmyer never witnessed Kimmel drafting the Steaver Letter. Although Smithmyer testified that he did not

_____

[5] The trial court also noted that

> in comparing the Bill Steaver Letter with Commonwealth's Exhibit 145, which contains a letter authored by [Kimmel] to his mother that SCP correctional officers mistakenly gave to Smithmyer, and the 5 letters that were read into the record by PSP Trooper Sean Tray at trial, which were admitted into evidence without objection to their authentication and/or that they were written by [Kimmel], it is obvious that the distinct almost unreadable handwriting of the aforementioned letters is identical to that of the Bill Steaver Letter.

Trial Court Opinion, 3/25/24, at 12 n.22.

witness Kimmel write it "word for word" he did observe Kimmel writing it. **See** N.T., 12/6/23, at 470.

Following our review of the record, we discern no error with the trial court's findings and conclusion regarding the authentication of Exhibit 146 (the Bill Steaver Letter). The above quoted portion of the trial court's Rule 1925(a) opinion correctly summarized the relevant testimony and analyzed the issue. Thus, we affirm on that basis.

In Kimmel's final issue he challenges the weight of the evidence.[6] Kimmel argues that he could not be found guilty without the evidence that he claims in his first two issues was illegally admitted.[7] **See** Appellant's Brief, at 16-17. He argues that the guilty verdict was based on speculation because none of the eyewitnesses positively identified him, and he could not be identified on the surveillance footage. **See id.** at 17. Further, he contends that he could not be convicted because "[t]here were no fingerprints found at the

---

[6] The trial court noted that Kimmel failed to preserve a weight of the evidence challenge by not raising it prior to appeal. **See** Trial Court Opinion, 3/25/24, at 4. However, the trial court still provided a thorough review of the evidence and explanation for why Kimmel's weight of the evidence challenge is without merit. **See id.** at 4-10. We agree with the trial court that Kimmel waived this issue. Regardless, Kimmel's argument is without merit.

[7] In his Rule 1925(b) statement and the statement of questions involved portion of his brief, Kimmel clearly challenges the *weight* of the evidence; in his actual argument he states that the there was *insufficient* evidence rather than the evidence being against the weight of the evidence. **See** Appellant's Brief, at 16-17. Therefore, we address Kimmel's claim as a weight of the evidence claim. However, our review of the evidence also indicates that there was sufficient evidence to convict Kimmel of first-degree murder.

scene, no DNA found at the scene, no blood found in Kimmel's vehicle, . . . and no confession." *See id.* Kimmel's argument is without merit.

> To convict a defendant of first[-]degree murder, the Commonwealth must establish a human being was unlawfully killed, the defendant was responsible for the killing, and the defendant acted with malice and a specific intent to kill. The Commonwealth may use wholly circumstantial evidence to discharge its burden of showing the accused intentionally killed the victim, and circumstantial evidence can itself be sufficient to prove any or every element of the crime[.]

*Commonwealth v. Perez*, 93 A.3d 829, 841 (Pa. 2014) (internal citations omitted).

> A verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. It is well established that a weight of the evidence claim is addressed to the discretion of the trial court, and a new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial court is to determine whether, notwithstanding all the evidence, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice.
>
> In reviewing a challenge to the weight of the evidence, the function of an appellate court is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence. Appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose an abuse of discretion.

*Commonwealth v. Anderson*, 323 A.3d 744, 756-57 (Pa. 2024) (internal citations, quotation marks, and brackets omitted).

The trial court extensively detailed the evidence that supported the guilty verdict for first-degree murder when it delivered its verdict and in its

1925(a) opinion. **See** N.T., 12/8/23, at 756-62; Trial Court Opinion, 3/25/24, at 5-10. At the conclusion of the trial the trial court recounted the evidence in finding Kimmel guilty of first-degree murder. The trial court noted that it was clear that the Victim was dead. N.T., 12/8/23, at 757. Further, the trial court reasoned that the specific intent to kill and malice were established by the perpetrator laying in wait and the "gruesome, brutal evidence of 61 stab wounds[]" several of which would have been fatal. **Id.** at 757-58. The trial court then addressed the evidence that supported its finding that Kimmel was the perpetrator who killed the Victim. We now quote the extensive discussion by the trial court:

> So the issue before the Court is: Was [Kimmel] the one who killed [the Victim] with the specific intent to kill and with malice?
>
> So we look at the evidence. We start with the factual witness. And Attorney Kirwan cites the testimony of Mr. Rosselli.
>
> And I agree that Mr. Rosselli was a good witness. I also know that Mr. Rosselli saw this incident in a split second (hand clap), very quickly. He was getting off his porch.
>
> His testimony was also that he didn't—he thought the victim was actually being punched by [Kimmel], so he was mistaken in that until he actually started crossing the street and he realized that the perpetrator was actually stabbing the [V]ictim.
>
> And he described what [Kimmel] was wearing, the dark clothes. And he also described as being 6 foot and 200 pounds; and that's consistent with the testimony of Richard Michalik.
>
> And then the state police put together evidence of—video evidence to show that [Kimmel] left his house at—seven videos between 1:23 and 2:03 a.m. And it was clear that it was [Kimmel's] vehicle. It had the white box in the back.

- 10 -

And that vehicle, through that video evidence, was traced from the house of where [Kimmel] was staying with his grandparents to the Boyer's [Food Market parking lot] in Shenandoah. And then there is also video evidence at 6:09 [a.m.] to 6:58 [a.m.] of that same vehicle leaving the Boyer's and going back to that same scene. So that's very strong evidence that [Kimmel] was the driver of his vehicle.

So [Kimmel] had a statement [to police]. His statement was that he was coyote hunting. In essence he said that he did leave that house, [and] he came back[.] . . .

We heard the evidence from the phone calls with his mother. . . .

First of all, in those phone calls, it says your calls are going to be recorded. And I think in just about every call—and Attorney O'Pake, the prosecution, presented all those calls. And the mother says in the beginning of those calls, Nathaniel, don't talk about your case. She didn't want him to talk about the case; but he couldn't stop going back to the case, and she got him off talking about the case.

But just about at the end of every one of those phone calls he says the same thing. He says, Mom, just read the letters, follow the letters. So [Kimmel], it's his—a lot of this is his evidence himself, the letters themselves. And there's one letter up there, but all these other letters, they could have just as well. The letters were basically covering up his lies.

It's so obvious that as the evidence came in [Kimmel] realizes that his truck was at the scene. Then he has to change his story. He changes his story, and then he tries to get his family to lie for him.

So the letters themselves, they might as well just have said, Mom, I killed [the Victim]. In order to get away with it and have my story make sense, this is what I need you to do. And—and basically that's what he was doing. He was giving instructions to his family what they need to do to try to make his alibi make sense. And it didn't make sense.

And as stated by the prosecution, the one letter, which the time frame was pointed out, only the killer would know some of the information that was in that letter, in the Bill Ste[a]ver letter.

And there was a[n] objection by defense counsel. But I heard the testimony of the correctional officer. There's no question that that letter was in [Kimmel's] possession and he tried to cover up that letter. I mean, he first—they said he fumbled with it, tried to stick it under his Bible, and then—then he tried to put it in his waist. He tried to cover that letter up, and then it was put on the bed. And the letter basically implicates him in the murder.

A lot of times in criminal cases you have eyewitnesses, circumstantial evidence. In this case you have everything. And you have DNA evidence and strong DNA evidence.

The burn pile. And the burn pile is consistent with the video that was put together by the state police. And Attorney Kirwan raises an issue as far as we don't know what was in that burn pile. We know what was left. I mean, there could have been a bandana in there. There could have been stuff that was burned. I mean, [Kimmel] obviously puts in his letters. He's trying to cover up with a bandana and gloves.

But [Kimmel] wasn't with [the Victim] in months and his DNA is on her fingers, on her fingernails. His DNA is on the water bottle, and [the Victim's] DNA is on the water bottle that are found at the burn pit.

Just as the Commonwealth has proven beyond a reasonable doubt that [the Victim] is dead, they have also proven that [Kimmel] is the one who killed [the Victim] and [Kimmel] killed her with malice and he did so with a specific intent to kill. The Commonwealth has proved beyond a reasonable doubt that [Kimmel] is guilty of first[-]degree murder.

N.T., 12/8/23, at 758-62.

From our review of the record, we discern no abuse of discretion in the trial court's weighing of the evidence. Therefore, Kimmel's weight of the evidence claim is without merit.

- 12 -

In sum, we conclude that Kimmel's claims lack merit. Thus, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/24/2025