J-A20016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TERRENCE JOHNSON | : | |
| | : | |
| Appellant | : | No. 649 EDA 2024 |

Appeal from the Judgment of Sentence Entered February 2, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001789-2022

BEFORE:   MURRAY, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY McLAUGHLIN, J.:          **FILED DECEMBER 10, 2025**

Terrence Johnson appeals from the judgment of sentence entered following his convictions for first-degree murder, firearms not to be carried without a license, and possession of an instrument of crime.[1] Johnson challenges the court's denial of his motions to suppress, the admission of evidence, and the denial of his **Batson** challenge.[2] We affirm.

The factual and procedural history of this case is as follows:

At about 9:00 p.m. on Friday, May 28, 2021, four black males were involved in a shooting on the 800 block of East Allegheny Avenue in Philadelphia, which resulted in fatal gunshot wounds to Vincent McClain. Two of the males had 9mm semiautomatic handguns. Several surveillance videos were recovered from police pole cameras and security

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 6106(a)(1), and 907, respectively.

[2] **Batson v. Kentucky**, 476 U.S. 79 (1986).

cameras inside a Chinese takeout restaurant showing the shooting.

The video record showed that Brandon Johnson, [Johnson's] brother, arrived outside the restaurant in a Blue Chevy Equinox, an identical vehicle to which was later found to be registered to [Johnson]. [Johnson] arrived outside the restaurant as a passenger in a burgundy Buick LaCrosse, which parked immediately behind the Equinox. An identical Buick LaCrosse was registered to Nadia Morales, [Johnson's] girlfriend, with whom he resided in Paoli, Pennsylvania.

Shortly before the shooting[,] [Johnson] and his brother, Brandon Johnson, were inside the restaurant. The video shows that the two clearly knew each other and Brandon Johnson can be heard referring to [Johnson] as his brother. Brandon Johnson was wearing a yellow jacket with black accents. [Johnson] was wearing a Nike hooded jacket and jeans.

[The victim] arrived at the location with another male in a rented Lamborghini SUV, at which point [Johnson] had walked back to the LaCrosse. Brandon Johnson and [the victim] got into an argument outside the restaurant, which lasted a few minutes.

During the argument, [Johnson] went to the Equinox and sat in the driver's seat, where he can be seen reaching into the console, from which he appeared to remove something which he concealed in his waist area. [Johnson] then walked to where his brother and [the victim] were arguing. As [the victim] walked away, [Johnson] pointed a gun which he had concealed behind his back, then fired it at [the victim] who ran toward, then past his Lamborghini, before collapsing. A fourth male, subsequently identified as Vaughn Wiley, exited the vehicle and started shooting at [Johnson] and his brother, before fleeing on foot, later to be found hiding in a nearby yard. [Johnson] and his brother fled the scene.

Detectives conducted surveillance at the Paoli address where [Johnson] lived with his girlfriend, Nadia Morales, who was the owner of a 2016 Burgundy Buick LaCrosse. A Chevy Equinox identical to the one at the scene of the shooting was parked at [Johnson's] Paoli residence.

Police obtained an arrest warrant for [Johnson] and a search warrant for his Paoli residence, which was executed on October 12, 2021. Johnson was arrested at the residence. Ms. Morales turned over three iPhones, one of which she identified as [Johnson's]. Also seized during the search was a distinctive blue metallic key chain with a Chevy insignia and a Grand Canyon National Park souvenir ball, matching one seen in security video to have been held by the shooter when he was inside the restaurant prior to the shooting. Brandon Johnson's wallet and an appointment card for Terrence Johnson were found during a search of the Chevy Equinox. A Buick LaCrosse identical to the one show in the videos was found in a detached garage.

Pa.R.A.P. 1925(a) Opinion ("Trial Ct. Op."), filed 10/21/24, at 2-3.

Johnson filed three motions to suppress. He sought to suppress evidence seized pursuant to the warrant for the Paoli residence on the grounds that it was stale, insufficiently individualized, and lacked a nexus between the crime and the home. *See* Motion to Suppress Evidence Recovered from the Search of 133 Cedar Hollow Rd [sic], Paoli, PA, filed 10/3/23 and 11/29/23. Regarding the warrant for the three cell phones, he contended it was unsupported by probable cause, overbroad, and insufficiently particularized. Motion to Suppress Evidence Recovered from Petitioner's Electronic Device, filed 8/2/23. As for the warrant for the phone records, he claimed it lacked probable cause, was overbroad, and lacked particularity. Motion to Suppress Evidence [of] Call Data and Cell Tower Records, filed 12/12/23. Additionally, Johnson filed a motion to preclude any Commonwealth trial witness from identifying Johnson in the surveillance videos. Motion to Preclude Identification, filed 8/2/23. The Honorable Scott O'Keefe presided over the hearing of the motions.

- 3 -

At a hearing, following the Commonwealth's assurance that it would not have the police identify Johnson from the video, the court granted Johnson's motion to preclude trial testimony identifying him in the surveillance videos. N.T., Motion Vol. I, 11/29/23, 5-6. For the suppression motions, the court heard testimony from a homicide detective, Detective Robert Daly. Additionally, the Commonwealth put into evidence one of the search warrants for the phones, and the defense admitted the search warrant for the Paoli residence. *See* Commonwealth Exhibit 1 (search warrant for Johnson's cell phone); Defense Exhibit 1 (search warrant for Paoli residence).

Detective Daly testified that the day following the killing, he patrolled the area of the attack and recovered numerous surveillance videos that showed the shooting. In the videos, he "had a clear picture of the offender and . . . a vehicle the offender arrived in, as well as another vehicle the offender went into before the shooting." N.T., Motion Vol. I, 11/29/23, at 14. These vehicles were a burgundy Buick LaCrosse and a blue Chevy Equinox. *Id.* at 14, 15. He stated that the videos showed Johnson arriving in the Buick and entering the Chevy right before the shooting. *Id.*

Detective Daly stated that the shooting occurred near a Chinese store that had surveillance cameras from which he had recovered footage. In that video, he observed Johnson inside the store with a male he later identified as Johnson's brother. *Id.* at 15. Approximately four and a half months after the shooting, in October 2021, a detective informed Detective Daly that there was surveillance footage of Johnson's brother in front of the same Chinese store.

*Id.* at 17. Detective Daly "came upon a photograph" of Johnson and compared it with the male in the surveillance footage and determined that the photo and the video depicted the same person. *Id.* at 18. Following a records check, he learned that Johnson was living with a woman named Nadia Morales at the Paoli residence. Police stopped Morales, who was driving a Buick LaCrosse like the vehicle Detective Daly seen in surveillance footage. *Id.* at 19. Morales was the registered owner of the Buick. *Id.* at 21. A Bureau of Motor Vehicles check showed Morales's address as the Paoli residence. *Id.* Detective Daly conducted "B.M.V. checks on Mr. Johnson which showed his most current B.M.V. address was 133 South Cedar Hollow Road in Paoli, Pennsylvania." *Id.* at 19.

Detective Daly obtained an arrest warrant for Johnson, and Detective Matthew Brown of the Willistown Township Police Department applied for a search warrant for the Paoli residence. *Id.* at 22; *see* Motion to Suppress Evidence Recovered from the Search of 133 Cedar Hollow Rd [sic], Paoli, PA, Exhibit A, at 2 (unpaginated). In the affidavit of probable cause, Detective Brown explained that Detective Daly had contacted him about the homicide in Philadelphia and told him that Johnson had been identified as the perpetrator and currently resided at the Paoli residence. Detective Brown included details of Detective Daly's investigation, such as information about the surveillance evidence from the night of the murder and the surveillance footage from October 2021. He stated that the male believed to be the shooter wore "a gray Nike hooded zip up jacket, tight blue jeans, and white sneakers." *Id.* Detective Brown additionally asserted that he and another detective had driven past the

Paoli residence on the previous day and saw a blue Chevy Equinox and a black Nissan Maxima parked on the street near the residence. He stated that a BMV check revealed that the Chevy was registered to Johnson and the Buick was registered to Johnson's girlfriend. He also reviewed the surveillance footage from the night of the murder and determined that the Chevy at the Paoli residence was identical to the one seen in the surveillance footage.

The affidavit of probable cause concluded with a request to search the residence and garage for:

> Any firearms, ammunition, ballistic evidence, gray Nike zip up jacket, blue jeans, white sneakers, cellular devices, vehicle keys to a Buick Lacrosse, Chevy Equinox, to secure and recover any vehicles parked on location for further investigation and proof of indicia.

*Id.*

The court granted the warrant for the Paoli residence and on October 13, 2021, officers executed it. Johnson and Morales were present at the time of the search. Both the Chevy Equinox and the Buick LaCrosse were on the scene and officers recovered the keys for both vehicles. Detective Daly noted that officers recovered a "blue Chevrolet key chain with it [that] looked like a baseball[.]" N.T., Motion Vol. I, 11/29/2023, at 26. He said it stood out to him "because the offender was carrying that inside the Chinese store before the shooting, as well as the key to the Chevy that was in his hand, inside the store, which was identical to the key to the Chevy that was parked in the driveway" at the residence. *Id.*

Detective Daly and another detective drafted a search warrant application for each of the three cellphones recovered from Johnson's girlfriend. The application requested permission to search and seize "any and all text messages, . . . messaging applications that's on the device, any and all photographs, any and all unique identifies, within the device, all of that information." *Id.* at 39; *see also* Motion to Suppress Evidence Recovered from Petitioner's Electronic Device, Exhibit A, at 1 (unpaginated). Detective Daly explained that each of the warrants was identical except for the description of the phone identified in each warrant. N.T., Motion Vol. I, 11/29/2023, at 41. Detective Daly explained:

> As explained herein, information electronically stored within a smartphone may provide crucial evidence of the who, what, why, when, where and how of the criminal conduct under investigation, thus enabling the Commonwealth of Pennsylvania to establish and prove every element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a smartphone can indicate who has used or controlled the device at or near a crime in question.
>
> This user attribution evidence is analogous to the search for indicia of occupancy while executing a search warrant at a residence. For example, text messages, contact lists and images sent and the data associated with the foregoing such as date and time may indicate who used or controlled the device and who possessed instruments of the crime, i.e., firearms, vehicles, clothing worn by the offender and narcotics at the relevant time.
>
> Further information stored within the smartphone can show how and when the smartphone was accessed or used, for example, as described below, smartphones log and store GPS locations, along with the time and date. Information stored within the smartphone may further indicate the

geographic location of the phone's user at a particular time, e.g., location information integrated into an image or video sent via e-mail, text message or iMessage.

Finally, stored electronic data in cell phones may provide relevant insight into the possessor of the phone's state of mind as it relates to the offense under investigation. For example, information in the phone may indicate the owner's motive and intent to commit a crime, e.g., communications relating to the crime or consciousness of guilt, e.g., deleting communications in an effort to conceal them from law enforcement.

This information has proven to be instrumental in criminal investigations in the past and has helped develop numerous leads, provide context to crimes and has helped establish probable cause for arrests and further search warrants.

It's your affiant's belief that the electronic information stored within the devices recovered during this investigation is now material in this murder investigation, as well as subsequent investigation into the alleged crack/cocaine, firearms and their origins which were recovered pursuant to the search of Terrence Johnson's residence.

Motion to Suppress Evidence Recovered from Petitioner's Electronic Device, Exhibit A, at 7; *see also* N.T., Motion Vol. I, 11/29/2023, at 60-62.

In January 2024, the court heard arguments for the motion to suppress the cell phone records. *See* N.T., Preliminary Hearing Vol. I, 1/9/24.

The court denied each of Johnson's motions related to the search of the Paoli residence and cell phones. *See* Orders, filed 1/22/24 and 1/23/24. The court later issued an opinion finding that because Johnson shared them with his girlfriend, he had no "subjective expectation of privacy" in, and "lacked standing to contest the search of," the Paoli residence, the Buick LaCross, and the Chevy Equinox. Findings of Fact and Conclusions of Law, filed 7/23/24, at

15. It further concluded that "insufficient facts were presented to establish an expectation of privacy in the phones that were in possession of Ms. Morales and were powered on." *Id.*

Regarding whether probable cause existed for the search of the home and cell phone records, the court determined the issuing authority committed no error in granting the warrant applications. *Id.* at 18-19, 20-21. The court also determined that the warrants for the home and cell phone records were not overbroad or stale, finding that the cell phone records were "specialized records including location, call/text data records, and electronically stored records" and "examining the timeliness of the information as well as the nature of the crime and type of evidence it is clear that the information was not stale." *Id.* at 22, 25.

Johnson proceeded with a jury trial before the Honorable Giovanni Campbell. Before selecting the jury, the parties agreed that during individual *voir dire*, the court would ask the following questions: "[H]ave you or anyone close to you been a victim of gun violence?" and "[A]re you or anyone in your household a member of a community or townwatch[?]" N.T., Trial (Jury) Vol. I, 1/29/24, at 2-3, 4.

The court then stated that its process during *voir dire* was to separate the jury into two groups. *Id.* at 4. Counsel objected, stating that when the jury is separated "by some preliminary answers to the questions, we don't even get to look at that second group prior to jury selection." *Id.* at 5. He went on to say that in his experience "African[-]American jurors tend to

answer some questions as to fairness and then get put in the second group more than white jurors." *Id.* at 9. The court responded that "the A and B group separation happens because someone answers a question in a way that would indicate a lack of fairness or impartiality. So it's not like we make up a name. These are based on some personal criteria[.]" *Id.* at 7. It went on to explain that the separation does not preclude fairness, stating that it "serves not only efficiency but fairness to apply the individual *voir dire* to those jurors that don't seem to indicate a lack of fairness on their face and the efficiency is an added benefit." *Id.* at 7, 8. The court also stated that while it had seen panels where African-American jurors were placed in the second group as compared to white jurors, the court had also seen cases where that did not occur. *Id.* at 9-10. The court overruled counsel's objection and added that the case was in Philadelphia and "it's not like you will be without jurors of color who can't answer those questions in a way that's impartial." *Id.* at 9.

The court then began jury selection. First, the court questioned the entire jury pool and then separated it into two groups. *Id.* at 11-21, 21-22. The court then conducted individual *voir dire* with each group, starting with Group A. *Id.* During *voir dire* of Group A, the Commonwealth used one of its peremptory strikes against juror number 32. *Id.* at 79. Defense counsel raised a **Batson** objection, stating that the juror was "one of two eligible black jurors who have been even possible to be selected" and "[t]here is nothing wrong that indicates he would not be a sufficient juror and he is struck." *Id.* at 79, 80. The Commonwealth argued that the defense had not shown a pattern,

and counsel responded that no pattern could be shown since "there is only two. He is the only black male." *Id.* at 80. The Commonwealth replied that it had exercised the strike because the juror had "hardly filled out the questionnaire. The Court had to ask him questions about his education level. None of the questions were answered[.]" *Id.* at 80-81. The court denied the *Batson* challenge. *Id.* at 81.

At trial, the Commonwealth admitted a video compiled by Detective Daly showing various views of the area of the crime on the night of the murder. *See* N.T., Hearing Vol. II, 2/1/24, at 14. Detective Daly explained:

> So after we left the crime scene, we compiled all of the video. We reviewed it. We also had, like I said, sources of video from pole cameras now. Now we had two vehicles of interest, one being a blue Chevy Equinox and the other one being like a maroon Buick LaCrosse because **the Defendant** arrived in the Buick LaCrosse but during the incident, he went into the Chevy Equinox immediately before the shooting. So we have two checkpoints there. We have the Equinox and the LaCrosse and we have an image of **the Defendant** from inside the store[.]

*Id.* at 19 (emphasis added).

Defense counsel objected without stating a basis for the objection, and the court overruled the objection. Detective Daly then testified, "We had an image from **the Defendant** inside the store that we disseminated with patrol alert, as well as I –." *Id.* (emphasis added). Counsel asked to see the court at sidebar and the court overruled the request. *Id.* at 19-20. Detective Daly testified that eventually another officer recovered more surveillance footage from the area in which "he saw Brandon Johnson, not the corner. . . . I didn't

know who the male was when I say Brandon Johnson at the time but I looked at the video and I knew that was the male in our yellow fleece that was in the store, that was interacting with **the Defendant**, so –." *Id.* at 22-23 (emphasis added). Counsel objected and moved to strike the testimony. *Id.* at 23. The court sustained the objection and gave an immediate curative instruction telling jurors that they were to "determine whether the Defendant was anywhere on that video." *Id.* Following a recess, counsel moved for a mistrial on the basis that Detective Daly's identification of Johnson in the surveillance videos violated Judge O'Keefe's order that no witness was to identify him in the surveillance footage. *Id.* at 71-73. The court denied the motion noting that it sustained counsel's objection and gave a curative instruction like the instruction it would give at the end of trial. *Id.* at 73.

Defense counsel cross-examined Detective Daly about police directives related to surveillance video recovery forms. *Id.* at 125, 127, 133, 139; Defense Exhibit 18. While asking these questions, counsel referenced different pages of the forms. The court directed counsel to move on, stating that he was "beating a dead horse about a form that was answered many times," and admonishing that "it's the same form for different videos." *Id.* at 140-41.

The jury found Johnson guilty of first-degree murder, firearms not to be carried without a license, and possession of an instrument of crime. The court sentenced him to life imprisonment for first-degree murder and concurrent sentences for the other convictions. This timely appeal followed.

Johnson raises the following claims:

Did the trial court and suppression court each err, when:

1. Denying [Johnson's] motions to suppress evidence arising from a search of [Johnson's] home, seizing a unique keychain; and cell phones; as well as the subsequent search of the cell phones and related historical cell data?

2. Violating [Johnson's] right to equal protection of the law, by dividing the venire into two classes of jurors, over objection, resulting in only two Black jurors being available for half the *voir dire*, and 2) denying [Johnson's] **Batson** challenge to the strike of prospective juror 32?

3. Abusing its discretion and violation [Johnson's] right to confront a witness, secured by the Confrontation Clause of the Sixth Amendment, by restricting counsel's cross examination of the lead detective regarding his failure to adhere to police policy and procedure related to the seizure of video evidence?

4. Abusing its discretion and erring when it denied a mistrial motion after permitting the assigned detective to identify [Johnson] as a person depicted in a video, even though such identification had been precluded by a pretrial ruling?

Johnson's Br. 2-3.

**SUPPRESSION**

Johnson claims the court erred in denying the suppression motions for the Paoli residence, the cell phones seized from that residence, and the information recovered from those cell phones. Our review of the denial of a suppression motion:

is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant

- 13 -

is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

**Commonwealth v. McMahon**, 280 A.3d 1069, 1071 (Pa.Super. 2022) (citation omitted).

Johnson maintains that the warrant for the Paoli residence did not establish a nexus between the home and the crime. He asserts that like the warrant in **Commonwealth v. Jacoby**, 170 A.3d 1065, 1084 (Pa. 2017), the warrant here lacked information "individualized to the suspect and the circumstances of the case." Johnson's Br. at 18 (quoting **Jacoby**, 170 A.3d at 1084). Johnson also claims that the warrant failed to explain why evidence connected to the shooting would be found at the home four months after the shooting. He further points out that nothing in the warrant suggested that Johnson resided at the home at the time of the shooting. He therefore argues that the affidavit failed to establish probable cause.

"[T]he Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures by police in areas where individuals have a reasonable expectation of privacy." **Commonwealth v. Hall**, 305 A.3d 1026, 1032 (Pa.Super. 2023) (citation omitted). "Where there exists a reasonable expectation of privacy, Article I, Section 8 and the Fourth Amendment generally require police to obtain a warrant, issued by a neutral and detached magistrate and founded upon probable cause, prior to

conducting a search or seizure of a person and/or a person's property" unless an exception applies. *Id.* at 1032-33 (citation omitted). Determining whether probable cause exists is determined by the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

"[P]robable cause to believe that a man has committed a crime on the street does not necessarily give rise to probable cause to search his home." *Commonwealth v. Nicholson*, 262 A.3d 1276, 1280 (Pa.Super. 2021) (quoting *Commonwealth v. Wallace*, 42 A.3d 1040, 1049-50 (Pa. 2012)) (emphasis removed). Rather, "[t]he affidavit of probable cause must establish a 'substantial nexus' between the suspect's home and the criminal activity or contraband sought to permit the search of the home." *Id.* In determining whether to grant a warrant application, a court must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [it] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Commonwealth v. Ani*, 293 A.3d 704, 716 (Pa.Super. 2023) (citation omitted). When a reviewing court examines an order granting a warrant, it only decides whether "a substantial basis existed for the magistrate to find probable cause." *Commonwealth v. Johnson*, 42 A.3d 1017, 1031 (Pa. 2012).

The "age of the information supporting a warrant application is a factor in determining probable cause." *Commonwealth v. Leed*, 186 A.3d 405, 413 (Pa. 2018) (cleaned up). "If too old, the information is stale, and probable cause may no longer exist." *Id.* (citation omitted). "However, staleness is not

determined by age alone, as this would be inconsistent with a totality of the circumstances analysis." *Id.*

Johnson's reliance on *Jacoby* is misplaced. Jacoby was charged with murder and numerous other offenses. Officers executed a search warrant for Jacoby's home 15 months after the murder. Jacoby moved to suppress, and the trial court denied the motion, concluding that the information in the application established probable cause to search of Jacoby's home and was not stale. The trial court found that "guns are durable and sometimes valuable objects that people typically hold on to for the long term," and that the fact that Jacoby was a convicted felon "increase[d] the likelihood that he would have held onto the firearm already in his possession." *Jacoby*, 170 A.3d at 1083.

The Pennsylvania Supreme Court determined that the trial court's conclusions were speculative because they were not "tailored or individualized to Jacoby in any fashion." *Id.* It also faulted the trial court for "overlook[ing] the significant gap of time between the murder and the search, and then attempt[ing] to buttress its conclusion with an unsourced assessment of general human behavior" in finding felons are more likely to retain firearms. *Id.* at 1084.

The same cannot be said for the instant case. Unlike the warrant application in *Jacoby*, the affidavit of probable cause here provided a substantial nexus between the crime and Johnson's residence. The murder occurred in May 2021, and officers applied for a search warrant for Johnson's

home in October 2021, approximately four and a half months later. The affidavit detailed Detective Daly's review of surveillance videos of the crime scene at the time of the shooting. This footage showed Johnson arriving at the scene in a Buick LaCrosse and moments before shooting the victim, briefly entering a Chevy Equinox and reaching for something in the vehicle. Further investigation revealed that Johnson and his girlfriend resided at the Paoli residence, and police learned that Johnson's girlfriend had a Buick LaCrosse registered in her name, and Johnson had a Chevy Equinox registered in his name. Officers observed a Chevy Equinox at the Paoli residence – they described it as identical to the vehicle seen in the surveillance footage – the day before they applied for the search warrant. The information in the affidavit of probable cause was not stale. The warrant application gave sufficient cause to establish a fair probability that in October 2021, evidence relating to the shooting would be found in the Paoli residence.

Johnson also claims the court "erred when it denied the motion to suppress the searches of the cellphones that were seized in Paoli, as well as the acquisition of historical cell data." Johnson's Br. at 15. He argues that the searches were improper for two reasons: 1) "each was the fruit of the initial and improper search and must be suppressed on that basis"; and 2) "the allegations leading to the seizure of each phone and the police examination of each and acquisition of historical data, were also deficient." *Id.* at 20. He maintains "there was no allegation that cell phone[s] had any connection to

the crime that was being investigated, and the affidavits did not say anything to the contrary." *Id.* at 21.[3]

Having concluded that the search warrant for the Paoli residence was supported by probable cause, we reject Johnson's contention that the cell phones were the product of an improper search. Cell phones were one of the items the search warrant listed as targets during the search of the Paoli residence and pursuant to that warrant officers seized all cell phones they found at the property, including those Johnson's girlfriend handed over.

We also disagree that the warrant to obtain the historical data for the cell phones was not supported by probable cause. The affidavit of probable cause contained information about the shooting, stated that Johnson had been identified as the perpetrator from surveillance footage, and relayed that Johnson fled from the scene immediately following the murder. Additionally, Detective Daly stated that, based on his knowledge and experience, "information stored within a smartphone can indicate who has used or controlled the device at or near a crime in question" and "can show how and when the smartphone was accessed or used, for example, . . . smartphones log and store GPS locations, along with the time and date." N.T., Motion Vol. I, 11/29/23, at 60-61 (Detective Daly reading portion of affidavit of probable

_____

[3] Johnson's citation to *Commonwealth v. Hamilton*, No. 1477 EDA 2016, 2018 WL 4443063, at *1 (Pa.Super. filed Sept. 18, 2018) (unpublished mem.) is improper because only non-precedential decisions of this Court filed after May 1, 2019, are citable. Pa.R.A.P. 126(b)(1). We have not considered *Hamilton*.

cause for Johnson's cell phone). Under the totality of the circumstances, the search warrant was supported by probable cause.

***VOIR DIRE/BATSON***

Johnson maintains that the court's separation of the jury into two groups had an impact on the racial makeup of Group A and "skewed the random nature of how jurors are supposed to be called for questioning." Johnson's Br. at 25; ***see*** 42 Pa.C.S.A. § 4501.[4] He alleges that the division "resulted in a racially disparate A group" that had only two African-American prospective jurors. ***Id.*** at 25. He further argues that the striking of juror number 32 was racially discriminatory in violation of ***Batson***. Johnson claims the court failed to complete the third part of the analysis of a ***Batson*** challenge, which is to decide whether racial discrimination is at work. He claims the court determined that the ***Batson*** claim failed because Johnson did not establish a pattern of racial discrimination. Johnson argues a single discriminatory strike is enough under ***Batson*** and that a pattern of discrimination is not required.

Our standard of review of a ***Batson*** challenge is settled:

_____

[4] 42 Pa.C.S.A. § 4501 provides:

It is the policy of this Commonwealth that:

   (1)   All persons entitled to a jury trial in a civil action or criminal proceeding shall have the right to jurors selected at random from a representative cross section of the eligible population of the county.

42 Pa.C.S.A. § 4501(1).

The scope of *voir dire* rests in the sound discretion of the trial court, whose decision will not be reversed on appeal absent palpable error. The purpose of *voir dire* is to ensure the empaneling of a competent, fair, impartial, and unprejudiced jury. The scope of *voir dire* should therefore be limited to questions that attempt to disclose a potential juror's lack of qualification or fixed opinion regarding the defendant's guilt or innocence. A prospective juror's personal views are of no moment absent a showing that these opinions are so deeply embedded as to render that person incapable of accepting and applying the law as given by the court.

***Commonwealth v. Holmes***, 327 A.3d 307, 313 (Pa.Super. 2024) (cleaned up).

Here, the court explained its process and reasoning for separating the pool of jurors into two groups as follows:

The A group was identified, then the entire panel of prospective jurors entered the room and were asked questions as a group. The members of the A group were then retained for questioning, while the remaining members of the panel were excused for lunch. Individual *voir dire* of the A group then proceeded. When the A group was exhausted and eight jurors had been selected, the Court moved on to *voir dire* of the B group. The balance (and majority) of the jury of (7 jurors and 2 alternates) was then selected from the B group.

The process was fair, efficient and did not prejudice or discriminate against either [Johnson] or any prospective juror.

Trial Ct. Op. at 5.

We discern no abuse of discretion. The record does not reflect that the court separated the jury into two groups for any reason other than efficiency. Additionally, the court's individual *voir dire* was "limited to questions that attempt[ed] to disclose a potential juror's lack of qualification or fixed opinion

regarding the defendant's guilt or innocence." **Holmes**, 327 A.3d at 313; **see** N.T., Trial (Jury) Vol. I, 1/29/24, at 2-3. Moreover, as the trial court pointed out, only eight jurors were selected from Group A, leaving seven jurors and two alternate jurors being selected from Group B.

Johnson's **Batson** claim likewise fails. A defendant who makes a **Batson** challenge must first "make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race[.]" **Commonwealth v. Scott**, 212 A.3d 1094, 1105-06 (citation omitted). If the defense meets its *prima facie* burden, the prosecution then bears the burden of "articulat[ing] a race-neutral explanation for striking the juror(s) at issue[.]" **Id.** at 1106 (citation omitted). The court "must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination." **Id.** at (citation omitted). "The trial court should consider the totality of circumstances when determining whether the prosecutor acted with discriminatory intent or engaged in purposeful discrimination." **Id.** (citation omitted). We, as the reviewing court, give "great deference" to a trial court's determination and absent evidence that the determination was "clearly erroneous," we will not overturn it. **Id.**

Furthermore, to make a *prima facie* case of racial discrimination under **Batson**, the defense must make a record of the race of all members of the jury pool, those struck by either side, and those who ultimately served as jurors:

The defendant does not satisfy **Batson's** first step of *prima facie* evidence merely by showing that the prosecutor used a number of strikes against venirepersons of one race. Nor is it sufficient to merely point out the fact that the prosecutor rejected a higher percentage of African–American potential jurors than non-African-American potential jurors. Instead, the defendant must preserve a full and complete record of the asserted **Batson** violation, as it would otherwise be impossible to conduct meaningful appellate review of the motivations of prosecutors in individual cases without such a record.

Within the *prima facie* case wherein a defendant must establish on the record the circumstances demonstrating purposeful discrimination, Pennsylvania law also requires that a defendant must make a record specifically identifying (1) the race or gender of all venirepersons in the jury pools, (2) the race or gender of all venirepersons remaining after challenges for cause, (3) the race or gender of those removed by the prosecutor, and (4) the race or gender of the jurors who served and the race or gender of jurors acceptable to the Commonwealth who were stricken by the defense.

**Commonwealth v. Murray**, 248 A.3d 557, 568 (Pa.Super. 2021) (quotation marks and citations omitted).

Johnson fails to meet his *prima facie* burden. There is no record of the race of all venirepersons in the jury pool, the race of jurors acceptable to the Commonwealth who were stricken by the defense, or the race of the jurors who served. Thus, Johnson failed to "make a *prima facie* showing that the circumstances [gave] rise to an inference that the prosecutor" struck juror number 32 on account of his race. **Scott**, 212 A.3d at 1105-06. As the trial court concluded, "the only information is that the stricken prospective juror and one other prospective juror in the first group were black." Trial Ct. Op. at 7; **see** N.T., Trial (Jury) Vol. I, 1/29/24, at 80 (counsel stating juror number

32 "is one of two African-American juror that were even eligible for us to choose"). The court did not err in rejecting the **Batson** challenge.

## CROSS-EXAMINATION OF DETECTIVE DALY

Johnson claims that by limiting his cross-examination of Detective Daly, the trial court infringed on his right to confront and cross-examine witnesses. Johnson argues that the court's actions prevented him from making the point that Detective Daly "failed to comply with departmental rules, policy, guidelines and recommendations with respect to each of the multiple videos gathered by him in connection with the investigation." Johnson's Br. at 35.

We review limitations on cross-examination for an abuse of discretion or error of law. **Commonwealth v. Rivera**, 983 A.2d 1211, 1230 (Pa. 2009). Whether a defendant's Confrontation Clause rights were violated is a pure question of law for which our standard of review is *de novo* and our scope of review is plenary. **Commonwealth v. Akrie**, 159 A.3d 982, 988 (Pa.Super. 2017). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about . . . harassment, and prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." **Id.** (citation omitted).

To the extent Johnson challenges a denial of his Confrontation Clause rights, it is waived for failure to make such an objection before the trial court. **See** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and

cannot be raised for the first time on appeal"). As to his challenge to the court's limitation of his cross-examination, this claim is meritless.

The trial court explained that it limited counsel's cross-examination of Detective Daly to ensure that the examination was "effective for determining the truth, to avoid wasting time, and to protect the witness from harassment." Trial Ct. Op. at 14. Although Johnson claims that the court's actions prevented him from making the point that Detective Daly failed to comply with police directives related to the recovery of surveillance footage, before the court ordered counsel to move on to another topic, counsel had questioned Detective Daly about his failure to comply with procedures. **See** N.T., Hearing Vol. II, 2/1/24, at 122-39. Moreover, Detective Daly conceded that he had not followed the protocol in the directives for the recovery of the surveillance footage. **Id.** at 138. Counsel also argued to the jury to Detective Daly failed to comply with the directives. **See id.** at 276-78. The court did not abuse its discretion.

**DENIAL OF MOTION FOR MISTRIAL**

Johnson argues that the court's curative instructions were inadequate because they did not address the issue he raised in his mistrial motion. He maintains that the court granted his motion *in limine* to preclude Detective Daly from offering an improper opinion as to the identification of the individual in the video. Therefore, according to Johnson, the court's telling the jury that it was the sole judge of the facts was insufficient and it should have instead

instructed the jury to ignore the testimony. He also maintains that the court should have struck the testimony but claims even proper instructions would not have cured the error.

We review the denial of a motion for mistrial for an abuse of discretion. *See Commonwealth v. Bennett*, 225 A.3d 883, 890 (Pa.Super. 2019). A mistrial motion may be granted "when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial." *Commonwealth v. Caldwell*, 117 A.3d 763, 774 (Pa.Super. 2015) (citation omitted) (*en banc*). The court must "determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial." *Id.* (citation omitted).

Here, the court gave a curative instruction to the jury that it was to "determine whether the Defendant was anywhere on that video." N.T., Hearing Vol. II, 2/1/24, at 23. Additionally, it instructed the jury that to find Johnson guilty of first-degree murder, it had to determine: "First, that Vincent McClain is dead; second, **that the Defendant killed him**[;] and, third, that the Defendant did so with the specific intent to kill and with malice." N.T., Trial (Jury) Vol. I, 2/2/24, at 25 (emphasis added).

The court did not abuse its discretion. After sustaining counsel's objection, the court gave an immediate curative instruction that it was up to the jury to make its own determination of the identity of the perpetrator in the surveillance footage. That was tantamount to telling it to ignore Detective Daly's identification testimony. Additionally, the court's instruction for first-

degree murder informed the jury that the identification of the defendant was a necessary element solely for the jury to determine. No relief is due.

Judgment of sentence affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 12/10/2025